Argued and submitted October 31, 1995, affirmed as to Goemmel; remanded for further findings with respect to Terhear July 31, 1996

STATE OF OREGON,
*Appellant,*

*v.*

JUSTIN GRAHAM TERHEAR,
*Respondent.*

(94-06-33814; CA A86125 (Control))

STATE OF OREGON,
*Appellant,*

*v.*

CARL E. GOEMMEL,
*Respondent.*

94-06-33815; CA A86126)
(Cases Consolidated)

923 P2d 641

Douglas F. Zier, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

David C. Degner, Deputy Public Defender, argued the cause for respondent Carl E. Goemmel. With him on the brief was Sally L. Avera, Public Defender.

No appearance for respondent Justin Graham Terhear.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

The state appeals from a pretrial order granting defendants' motions to suppress evidence. ORS 138.060(3). We affirm with respect to defendant Goemmel, and remand for further findings as to defendant Terhear.

On the afternoon of June 10, 1994, Portland Police Officer Andrew was on foot patrol in the Old Town district. Andrew saw defendant Goemmel ride by in the front passenger seat of a two-door car and noticed that Goemmel was not wearing a safety belt, in violation of ORS 811.210(1)(c).[1] A few minutes later, Andrew and his partner, Marshall, saw the same car parked in a truck loading zone and decided to investigate. The officers saw Goemmel still sitting in the front passenger seat and a young woman, Maiden, sitting directly behind him in the back seat. Andrew approached the car and told Goemmel that he had seen him ride by earlier while not wearing a seat belt and that the car was parked in a truck loading zone. Goemmel asked Andrew if he wanted him to move the car. Andrew said, "no," and then began questioning Goemmel about the whereabouts of the car's driver.

In the meantime, Marshall began questioning Maiden, because she appeared to be of school age, and asked her whether she should be in school. Because Marshall could not hear Maiden very well, he asked her to step out of the car, and she did so. Goemmel testified that he leaned forward in the passenger seat to allow Maiden to get out of the car, but that the officers told him to leave the car also. Both officers testified that they did not ask or tell Goemmel to get out of the car, but that he got out on his own to let Maiden out of the backseat. The trial court made no factual findings as to whether the officers ordered Goemmel out of the car.

Both officers continued questioning Maiden and Goemmel as they stood on the sidewalk next to the parked

[1] ORS 811.210(1)(c) provides:

"A person commits the offense of failure to use safety belts if the person:

"* * * * *

"(c) Is a passenger in a motor vehicle on the highways of this state who is 16 years of age or older and who is not properly secured with a safety belt or safety harness as required by subsection (2) of this section."

car. Andrew asked Goemmel if "there was [any] chance that [they were] in Old Town to buy drugs." Goemmel responded, "no." Andrew then noticed a backpack on the front passenger floorboard near where Goemmel had been sitting and two other backpacks in the backseat. Andrew asked him if the backpack in the front belonged to him, and Goemmel said that it did. Andrew testified that he then asked Goemmel if he minded if Andrew looked through the backpack and that Goemmel responded, "no." Goemmel testified that Andrew ordered him to remove the backpack from the car so that Andrew could search it. Goemmel testified that he initially protested but then removed the backpack from the car. The trial court made no findings as to whether Goemmel consented to the search.

After taking the backpack out of the car, Goemmel began removing items from it and showing them to Andrew. At the same time, Andrew peered into the bag and saw a small plastic baggy containing organic material that he believed to be a controlled substance. He asked Goemmel what the material was, and Goemmel said that it was "a natural hallucinogenic." Because Andrew believed that the baggy contained psilocybin, he seized it and placed Goemmel under arrest.

Shortly after Goemmel's arrest, Cecconi, the owner of the car, and defendant Terhear walked around a corner and toward the parked car. Terhear was carrying a food bag and a Gatorade squeeze bottle. During the suppression hearing, Andrew and defendants presented different versions of the events that followed.

Andrew testified that Goemmel had not been handcuffed when Cecconi and Terhear approached. He said that when Terhear reached the parked car, Terhear put the food and the squeeze bottle in the front seat. Andrew testified that he then asked Terhear if the backpack in the backseat was his and whether it contained any drugs and that Terhear told him that the backpack was his and that it might contain marijuana and paraphernalia. Andrew said that he asked Terhear to place the backpack on the trunk of the car and that Terhear did so. He then further testified that he obtained consent from Cecconi to search the car. During the

course of that search, Andrew opened the squeeze bottle that Terhear had placed in the front seat and discovered eight baggies of marijuana. He testified that a subsequent search of Terhear's backpack by a cover officer yielded more marijuana.

Goemmel testified that he had been placed in handcuffs before Terhear and Cecconi approached the parked car. He said that, when Cecconi and Terhear walked up to the car, the officers ordered them to set the food and squeeze bottle on the trunk of the car. He stated that the officers then searched the food and the squeeze bottle and found baggies of marijuana in the bottle. Goemmel testified that the officers then proceeded to search the car and moved Terhear's backpack to the trunk where a search of its contents yielded more marijuana. As with the issue of Goemmel's alleged consent, the trial court made no findings concerning the search of those items.

Goemmel was charged with possession of a controlled substance, ORS 475.992(4), and Terhear was charged with both possession of a controlled substance and delivery of a controlled substance. ORS 475.992(1). Before their trial, both defendants moved to suppress all the evidence discovered on June 10, 1994. The trial court granted those motions:

"What we have in this case is a police officer seeing a vehicle proceed by him with a person disobeying the law, not having a seat belt on, and then seemed to be parked * * * illegally in a loading zone. Approaching the passenger's side of the vehicle, the officer, six foot eight, large man, bends over to the window to address the passenger and tells him that the car is illegally parked and tells him that he broke the law by not wearing a seat belt.

"The question is did the defendant feel at that point that he could not leave, and if that belief was objectively reasonable? And I would think that anybody would be thinking that they were going to be cited at least for something, if they walked away, that there would be trouble.

"The officer himself testified that he did not know that if the defendant was free to leave either. So that was the basis of the stop. It was a stop. The officer then went beyond the basis of the stop in his inquiry impermissibly. So the court is going to sustain the motion to suppress. The rest of the

stuff that was derived was derived from the fact that the first search was illegal, flows from there, therefore, it's suppressed also."[2]

The state assigns error to the trial court's order granting both defendants' motions to suppress. With respect to Goemmel, the state contends that the trial court erred in concluding that the interaction between Andrew and Goemmel effected a stop. Goemmel responds that the court correctly determined that Andrew stopped him for a traffic infraction and that, under *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995), Andrew exceeded the scope of that stop by asking Goemmel about drugs and, thereafter, searching his backpack.[3]

The state also argues that the trial court erred in suppressing the evidence obtained from Terhear on the ground that it was "fruit of the poisonous tree." Terhear did not appear on appeal.

Our standard of review for search and seizure cases is set forth in *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993):

> "Determination of the legality of searches and seizures depends largely on the facts of each case. *State v. Warner*, 284 Or 147, 149, 585 P2d 681 (1978). What actually happened is a question of fact for the trial court. A trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings. *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). Our function is to decide whether the trial court applied legal principles correctly to those facts. *State v. Davis*, 295 Or 227, 238, 666 P2d 802 (1983)."

---

[2] The trial court, after finding that Goemmel was stopped while he was still in the car, did not proceed to determine whether Andrew asked or ordered Goemmel out of the car, or resolve which version of the events pertaining to Terhear was more accurate. Because of the temporal and logical relationship of the events presented here, we cannot assume, as in *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), that the trial court, in suppressing the evidence as to both Goemmel and Terhear, implicitly resolved factual disputes about the later events in defendants' favor. Rather, it is apparent that, as a sequential matter, the trial court ended its inquiry at the earlier point and did not go further.

[3] *Dominguez-Martinez* was decided after the trial court ordered suppression in this case.

■ We first address the state's appeal as to Goemmel. The state does not dispute the trial court's findings and, specifically, its finding that, upon approaching the parked car, Andrew told Goemmel "that the car [was] illegally parked and * * * that he broke the law by not wearing a seat belt." Instead, the state challenges the court's conclusion that, under the totality of the circumstances, there was a stop. In the state's view, the contact between Andrew and Goemmel, culminating in the search of Goemmel's backpack, was "mere conversation." The state particularly asserts that the court erred in referring to Andrew's height and bulk in assessing the totality of the circumstances because a police officer's size is immaterial to determining whether a stop has occurred:

> "Simply because a police officer's physical resemblance may be closer to Hulk Hogan's than to PeeWee Herman's has no bearing on whether—as a matter of law—a stop has occurred. Immutable physical characteristics of an officer cannot be a basis for a person to reasonably believe he or she has been stopped. To so conclude would permit people to rely, for example, on [an] idiosyncratic fear of certain groups of people * * * to automatically turn any encounter with a police officer from one of those groups into a 'stop.' That simply is not and cannot be the law."

■ We agree with the state that a police officer's physical attributes are, by themselves, immaterial to determining whether a stop has occurred. Here, there is no evidence that Andrew used his size in such a way as to enhance any restriction of Goemmel's liberty or freedom of movement. Nevertheless, and despite our departure from that aspect of the trial court's reasoning, we conclude for the reasons amplified below that, at the time Andrew requested consent to search Goemmel's backpack, the interaction between Andrew and Goemmel transcended mere "conversation" and constituted a traffic stop. ORS 810.410(3)(b). Accordingly, the trial court properly suppressed the contents of Goemmel's backpack. *Dominguez-Martinez*, 321 Or at 214.

■ ORS 810.410(3)(b) provides:

> "A police officer:

> "* * * * *

"May stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citations."

Under that statute, "an officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation." *Dominguez-Martinez*, 321 Or at 212. *Accord State v. Jones*, 141 Or App 63, 918 P2d 111 (1996) (police officer "stopped" a car under ORS 810.410 when officer stopped the car because the defendant was not wearing a safety belt; officer's request to search the defendant for drugs exceeded scope of that traffic stop). Here, the state does not contend that Andrew had some independently sufficient nontraffic basis to request consent to search Goemmel's backpack. Thus, our inquiry reduces to whether that request was made in the context of a traffic stop and, in particular, to whether interaction between Andrew and Goemmel was a "stop" or some other, less intrusive encounter.

■　　ORS chapter 810 does not define "stop" as used in ORS 810.410(3)(b). However, we have held that "stop" has the same meaning in the traffic context as in the nontraffic context. *See, e.g., State v. Horton*, 86 Or App 199, 201-02, 738 P2d 609 (1987):

"A 'stop' occurs when the police restrain a person's liberty by physical force or a show of authority. *State v. Warner*, *supra*, 284 Or at 162. A person is 'restrained' when, in view of all the circumstances, a reasonable person would have believed that he was not free to leave. *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *State v. Spenst*, 62 Or App 755, 662 P2d 5, *rev den* 295 Or 447 (1983)." *Id.* at 202.

*Accord State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991).[4]

---

[4] In *Holmes*, the court held that a "seizure" for purposes of Article I, section 9, of the Oregon Constitution, occurs

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *Id.*, 311 Or at 409-10 (footnote omitted).

The state argues that there was no stop here because, in the totality of the circumstances, a reasonably objective person in Goemmel's position would have believed that he was free to leave.[5] As support for that proposition, the state masses a battery of cases in which officers approached parked cars and either requested identification from the occupants or engaged the occupants in conversation.[6] In each instance, we concluded that the encounter did not significantly interfere with the defendant's liberty and, thus, was not a stop.

We do not dispute the continuing vitality of those decisions. However, the state ignores the critical—indeed, dispositive—distinction between those cases and this one: In none of those cases did the officer announce to the individual that he or she had broken the law in the officer's presence.[7]

■ Conversely, here, Andrew began the encounter by telling Goemmel that he had just seen him break the law. An ordinary citizen, faced with such a statement by a uniformed police officer, would not believe that he or she was free to leave. Rather, a person in Goemmel's position would reasonably believe that he or she was not free to go until the officer took some further action, such as issuing a citation or telling the individual that he or she could move on. Common experience and common sense admit no other answer. *Accord Holmes*, 311 Or at 410 ("The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has

---

[5] The state does not dispute that Goemmel subjectively believed that he was not free to go. Rather, the state argues only that such a belief was not objectively reasonable.

[6] *See, e.g., State v. Gilmore*, 123 Or App 594, 860 P2d 882, *rev den* 318 Or 171 (1993); *State v. Pavelek*, 122 Or App 181, 857 P2d 863 (1993); *State v. Fields*, 122 Or App 38, 857 P2d 179 (1993); *State v. Lunow*, 114 Or App 239, 835 P2d 129, *rev den* 314 Or 574 (1992); *State v. Woods*, 102 Or App 671, 796 P2d 1209, *rev den* 310 Or 422 (1990); *State v. Jensen*, 102 Or App 323, 794 P2d 448 (1990); *State v. Tetro*, 98 Or App 492, 779 P2d 1080 (1989); *State v. Eisenbarth*, 93 Or App 384, 762 P2d 343 (1988). *See also State v. Warner*, 136 Or App 475, 901 P2d 940 (1995); *State v. Lane*, 135 Or App 233, 898 P2d 1358, *rev den* 322 Or 360 (1995) (both involving similar parked car/request for identification or preliminary questioning scenarios; decided since the briefing in this case).

[7] *Accord State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 842 P2d 807 (1992). There, the officers told one of the defendants, Hendricks, "of the neighbors' complaints of drug dealing." *Id.* at 620. The officers did not accuse Hendricks of drug dealing, much less categorically inform him that they had seen him violate the law.

otherwise conducted himself [or herself] in a manner that would be perceived as nonoffensive contact if it had occurred between two ordinary citizens.").

Thus, we hold that Goemmel was stopped when Andrew requested consent to search Goemmel's backpack and that Andrew's request exceeded the scope of the stop. The trial court properly suppressed the evidence pertaining to Goemmel. *Dominguez-Martinez*.

With respect to defendant Terhear, we are unable to determine from this record the factual or legal basis from which the trial court concluded that the evidence obtained from Terhear was impermissibly "derived" from the illegal search of Goemmel's backpack. We agree with the state that, because the search of Terhear's belongings and the car are sufficiently distinct from the search of Goemmel's backpack, we cannot assess the validity of the former without additional findings by the trial court. Accordingly, we remand to the trial court for further findings concerning the particulars of Terhear's encounter with the police.

Affirmed with respect to defendant Goemmel; remanded for further findings with respect to defendant Terhear.