Submitted October 31, 2011, reversed and remanded June 27, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TYI ANTHONY STEFFENS,
*Defendant-Appellant.*

Multnomah County Circuit Court
100444521; A145746

282 P3d 888

Peter Gartlan, Chief Defender, and Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Matthew J. Lysne, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

In this criminal case, defendant appeals the trial court's judgment convicting him of unlawful possession of a firearm, ORS 166.250.[1] Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained as a result of a police inquiry during a traffic stop. Defendant argues that the inquiry was an unlawful extension of the traffic stop and, therefore, violated his right, under Article I, section 9, of the Oregon Constitution, to be free from unreasonable searches and seizures.[2] We agree and, therefore, reverse and remand.

Whether an officer has unlawfully extended a traffic stop is a question of law, which we review for errors of law. *State v. Rodgers/Kirkeby*, 347 Or 610, 625, 227 P3d 695 (2010) (citing *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993)). When conducting such a review, we are "bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports those findings." *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). We state the facts consistently with that standard.

Around 12:30 a.m., defendant was riding a bicycle in a southeast Portland neighborhood where crime, especially gang-related crime, is common. Portland Police Officers Mawdsley and Cole, who were in a patrol car, saw defendant fail to signal a left turn. They turned on their overhead lights and initiated a traffic stop.

Both officers got out of the patrol car and approached defendant. Mawdsley asked for identification, and defendant provided an Oregon identification card. Mawdsley took the identification card to the patrol car to check for outstanding warrants. While Mawdsley was in the patrol car, Cole spoke with defendant. Defendant made eye contact and seemed relaxed. Cole noticed that defendant's eyes were slightly

---

[1] ORS 166.250(1)(a) provides that, subject to certain exceptions, "a person commits the crime of unlawful possession of a firearm if the person knowingly * * * [c]arries any firearm concealed upon the person."

[2] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

glassy and that his breath smelled of alcohol. Cole informed defendant that it is unlawful to ride a bicycle while intoxicated. Defendant shrugged. Cole did not ask defendant how much he had had to drink, ask him to perform any field sobriety tests, or otherwise proceed with an investigation of whether defendant was intoxicated. Nothing about defendant's appearance suggested that defendant might be involved with a gang.

Meanwhile, in the patrol car, Mawdsley checked defendant's arrest history and received information indicating that defendant had been arrested five times, including one arrest the previous month for carrying a concealed weapon. The information did not indicate that defendant had been convicted of any crime or that he had a history of violence against police officers.[3] At that point, Mawdsley had all the information he believed that he needed to issue defendant a citation except defendant's telephone number.

Just after he learned of defendant's arrest history, Mawdsley overheard defendant tell Cole that he had been arrested once and that he had never been convicted. Instead of proceeding to investigate, cite, or release defendant in connection with the traffic violation, Mawdsley confronted defendant about his arrest history, saying something like, "So you say you've only been arrested once?" Defendant replied that he might have been arrested twice. Mawdsley told defendant that he knew about defendant's recent arrest for carrying a concealed weapon. Then he asked if defendant was carrying any weapons.

After the question about weapons, defendant's demeanor changed. Before the question defendant had been relaxed and unconcerned, but after the question he became extremely nervous. His arms and legs began shaking, and he stopped making eye contact. But, he did not make any furtive movements or put his hands in his pockets. He denied having a weapon, and—although he had become extremely nervous—he remained cooperative throughout the encounter.

---

[3] The record does not reflect that the information that Mawdsley received indicated that defendant had a history of violence against anyone.

Mawdsley requested consent to search defendant, and defendant responded, "I would rather you not." Defendant's shaking became more pronounced, and he started sweating. After a brief discussion, Mawdsley told defendant to put his hands on his head. Defendant complied, then let out a deep breath and dropped his head. Cole held defendant's hands in place, Mawdsley asked where the gun was, and defendant said, "Just take my coat off." The officers found a gun in defendant's coat.

Defendant was arrested and charged with unlawful possession of a firearm. He moved to suppress the gun that the officers found in his coat and his resulting statements. He argued that, although the traffic stop was lawful, the officers unlawfully extended the stop by inquiring about weapons and by searching him for weapons without reasonable suspicion that he was engaged in criminal activity or posed an immediate threat of serious physical injury to the officers. As a result, he argued, the inquiry and the search violated Article I, section 9, of the Oregon Constitution.

The trial court held that the inquiry and the search were unrelated to the traffic stop. The court also held that the inquiry and search extended the duration of the stop. But, the court held that the inquiry was justified because defendant's prior arrest for carrying a concealed weapon gave rise to reasonable suspicion that defendant posed an officer-safety threat. The court explained, "I think [the arrest on the concealed weapon charge], which was less than a month old at the time, is a sufficient basis to ask the question and to continue [the stop]." The court further concluded that the subsequent patdown was justified based on the officers' knowledge of the arrest and the change in defendant's demeanor after Mawdsley asked about weapons. Accordingly, the court denied defendant's motion to suppress. Defendant waived his right to a jury trial and tried his case to the court, which convicted him of the single charged count.

Defendant appeals, assigning error to the denial of his motion to suppress and arguing, as he did in the trial court, that the officers unlawfully extended the traffic stop by inquiring about, and then patting him down for, weapons.

The state responds that the inquiry about weapons was justified by reasonable suspicion that defendant posed an officer-safety threat because he had lied about his arrest history and had been arrested the previous month for carrying a concealed weapon. According to the state, those facts, in addition to defendant's nervousness after the inquiry about weapons, also justified the patdown.

For the reasons explained below, we agree with defendant that Mawdsley's inquiry into whether defendant was carrying weapons was not supported by specific and articulable facts sufficient to give rise to reasonable suspicion that defendant posed "an immediate threat of serious physical injury" to the officers. *State v. Bates*, 304 Or 519, 524, 526, 747 P2d 991 (1987). Mawdsley's inquiry caused defendant's demeanor to change suddenly. That change in defendant's demeanor, in turn, caused the officers to pat defendant down, which resulted in their discovery of the gun and defendant's statements about it. Consequently, the gun and the statements should have been suppressed. *See Hall*, 339 Or at 36 (evidence obtained as a result of an illegal seizure is inadmissible).

During a traffic stop, an officer may investigate the traffic infraction for which a person is stopped. ORS 810.410(3)(b). During an unavoidable lull in that investigation, such as while awaiting the results of a records check, an officer "is free to question [the person] about matters unrelated to the traffic infraction." *State v. Rodgers*, 219 Or App 366, 372, 182 P3d 209 (2008), *aff'd sub nom State v. Rodgers / Kirkeby*, 347 Or 610, 227 P3d 695 (2010). However, under Article I, section 9, of the Oregon Constitution, the "officer is not similarly free to question the [person] about unrelated matters as an alternative to going forward with the next step in processing the infraction, such as the writing or issuing of a citation." *Id.*

Nevertheless, an officer may extend a traffic stop in order to investigate a matter unrelated to the stop under certain circumstances: First, the officer may extend the stop if he or she has "reasonable suspicion of further criminal activity." *Id.* Second, the officer may extend the stop by taking "reasonable steps to protect himself or others" if he or she has

"a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates*, 304 Or at 524; *see also State v. Amell*, 230 Or App 336, 340, 341, 215 P3d 910 (2009) (applying the officer-safety doctrine in the context of a traffic stop after *Rodgers*). The state bears the burden of proving that an extension of a traffic stop is justified. *State v. Tucker*, 330 Or 85, 88-89, 997 P2d 182 (2000) (the state bears the burden of proving that a warrantless search or seizure is justified by an exception to the warrant requirement); *see also Amell*, 230 Or App at 340 (rejecting the state's argument that the officer-safety doctrine justified a patdown search in the absence of a search warrant).

Here, Mawdsley's inquiry into whether defendant was carrying weapons was not related to the basis for the traffic stop, which, as described, was defendant's failure to signal a turn while riding his bicycle. And, the inquiry extended the stop; it did not occur during an unavoidable lull in the stop. Mawdsley could have written the citation, asked defendant for his telephone number, if that was necessary, or let defendant go.[4] *See, e.g., State v. Kirkeby*, 220 Or App 177, 186, 185 P3d 510 (2008), *aff'd sub nom State v. Rodgers / Kirkeby*, 347 Or 610, 227 P3d 695 (2010) (officer's request to pat the defendant down did not take place during an unavoidable lull because, although the officer needed additional documents before he could issue the citation, "there [was] nothing in the record to indicate that [the officer] asked [the] defendant for those items or was waiting for [the] defendant to retrieve them, nor that he was engaged in any other steps related to the investigation of the traffic offense").

Thus, to be reasonable, Mawdsley's inquiry about weapons had to be based on reasonable suspicion that defendant was engaged in criminal activity or posed an officer-safety threat. The trial court did not conclude, and the state does not contend, that Mawdsley had reasonable suspicion that defendant was committing a weapons-related crime. As a result, the dispositive question in this case is whether

---

[4] If the officers had reasonable suspicion that defendant was riding his bicycle while under the influence of alcohol, they also could have investigated that issue.

Mawdsley's inquiry into whether defendant was carrying weapons was a permissible officer-safety measure, that is, whether Mawdsley's inquiry was based on reasonable suspicion that defendant posed "an immediate threat of serious physical injury to [Mawdsley or Cole]." *Bates*, 304 Or at 524.

The facts known to Mawdsley when he asked defendant if he had any weapons were as follows: (1) defendant had recently been arrested for possession of a concealed weapon; (2) defendant appeared to have lied about the number of times he had been arrested; (3) crime, especially gang-related crime, was common in the neighborhood; (4) defendant did not appear to be associated with a gang; (5) defendant's manner was relaxed, unconcerned, and cooperative; (6) defendant made no furtive movements; and (7) defendant had no known history of violence against police officers.

As a preliminary matter, the fact that the stop took place in a neighborhood where gang-related crime was common provides no support for Mawdsley's concern for the officers' safety given that nothing about defendant's appearance or conversation suggested that he might be involved in gang activity. As the Supreme Court explained in *Bates*, there must be a reasonable basis for suspicion with regard to *"this* defendant." 304 Or at 526 (emphasis in original); *cf. State v. Miglavs*, 337 Or 1, 13, 90 P3d 607 (2004) (officer-safety concerns justified patdown where the defendant's clothing clearly announced that he was a member of a particular gang and the officers' recent personal experience indicated that members of that gang, in that specific area, carried weapons).

Our cases demonstrate that, in the context of a traffic stop, the defendant's demeanor during the stop is critical to determining whether he or she poses an imminent threat of serious physical injury. *See, e.g., State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996) (where the "[d]efendant's demeanor throughout the encounter with [the officer] was entirely cooperative, nonhostile, and nonthreatening," the defendant's furtive movements and location outside the car did not support inquiry into whether the defendant had weapons); *State v. Peterson*, 143 Or App 505, 510-11, 923 P2d 1340 (1996), *rev den*, 327 Or 521 (1998) (where "there was

nothing in [the] defendant's behavior to suggest imminent aggressiveness or hostility toward [the officer]," the defendant's nervousness and furtive movements did not provide sufficient basis for inquiry into whether the defendant had weapons).

An officer's knowledge of the defendant's past conduct is relevant to the officer-safety inquiry; however, where past conduct is not coupled with any indication that the defendant is *currently* dangerous, it is unlikely to be determinative. *See, e.g., State v. Knox*, 134 Or App 154, 159, 894 P2d 1185 (1995), *vac'd on other grounds*, 327 Or 27, 957 P2d 1209 (1998) (where the defendant had never threatened or been violent with police and "was not acting in any unusually angry or strange manner," officer-safety concerns did not justify search of the defendant's truck even though the officer knew that the defendant had previously been investigated for drug offenses and homicide and knew that the defendant had a reputation for carrying weapons (internal quotation marks omitted)).

Although we have recognized that fact matching is not always a useful exercise in the context of the officer-safety doctrine, *Senn*, 145 Or App at 545, here, two cases provide particularly useful comparisons: *Amell*, 230 Or App 336, and *State v. Dyer*, 157 Or App 326, 970 P2d 249 (1998).

In *Amell*, an officer stopped the defendant for speeding. The defendant was "cordial and friendly," and he told the officer that the car he was driving belonged to his brother and that he had left his California driver's license at a bar that evening. 230 Or App at 338 (internal quotation marks omitted). When the officer sent the defendant's name to dispatch, however, he learned that the defendant's Oregon license was suspended. Another officer observed the defendant digging around in the center console area of the car. As a result, the first officer requested, and received, consent to search the vehicle and patted the defendant down. He found drugs and a knife, and the defendant was charged with and convicted of carrying a concealed weapon and unlawful possession of cocaine. *Id.* at 339.

On appeal, we held that the facts did not give rise to reasonable suspicion of a threat to officer safety. We listed

the "specific and articulable facts" that formed the basis for the officer's suspicion:

> "(1) [The] defendant had been cordial and friendly; (2) he had lied about his suspended Oregon driver's license; (3) he had been observed making a digging movement in the front of the vehicle out of the presence of the officers; and (4) he got out of the vehicle in compliance with the officer's request."

*Id.* at 341. After evaluating other cases dealing with defendants' movements inside vehicles, we concluded that the defendant's demeanor and cooperativeness demonstrated that he was not a threat, even in light of his furtive movements. We explained:

> "[T]here were no facts to characterize [the defendant's digging in the center console] as hostile. The conduct was not directed at the police officers or done in their immediate presence. * * * [The d]efendant responded to [an officer's] question about what he was doing in a nonhostile manner and remained cordial and polite. * * * In short, [the] defendant was cooperative at all times, did not show hostility, and made no suspicious movements during his interaction with the police officers."

*Id.* at 345.

Thus, in *Amell*, the defendant's cordial and polite demeanor outweighed the fact that the defendant had lied to the officer about his suspended license as well as the defendant's digging in the center console.

In *Dyer*, an officer observed the defendant drive carelessly, then park his car at a school and get out. The officer, who was on a bicycle, dismounted and approached the defendant, intending to cite him for his driving. The defendant was "cooperative and cheerful." 157 Or App at 329. The officer noticed that the defendant had a knife on his belt. Eventually, dispatch informed the officer that the defendant had been convicted of unlawful possession of a weapon in a public building. The officer asked the defendant to sit on the curb. *Id.*

The officer intended to have the defendant return to his car and then write him a citation. Before he did so, however, he asked the defendant if there were any weapons in the car, and the defendant said that there were not. The officer asked if he could look in the car, and the defendant said that he could not. The officer told the defendant that he intended to search the car despite the defendant's refusal to consent. After that explanation, the defendant's demeanor changed; he became agitated and repeated his objection to the officer's search of the car. In spite of the defendant's objections, the officer searched the car and found a gun under the driver's seat. The officer arrested the defendant, searched him, and further searched his car. Those searches yielded controlled substances, and the defendant was convicted on several counts. *Id.* at 330.

On appeal, we held that the officer's initial search of the vehicle was not supported by reasonable suspicion of a threat to officer safety. We explained:

> "[The officer's] description of [the] defendant's behavior during the encounter indicates that he had no specific safety concerns based on [the] defendant's behavior. Indeed, [the officer] testified that [the] defendant had been cooperative and cheerful until [the officer] informed [the] defendant that he was going to search [the] defendant's car despite [the] defendant's refusal to consent. * * * In short, there was no evidence that, at any point during the stop, [the] defendant posed an immediate threat of serious physical harm to anyone. [The officer] and [the] defendant were engaged in a routine traffic stop when [the officer] decided to conduct the search."

*Id.* at 333 (footnote omitted). That is, although the officer knew that the defendant had been convicted of a weapons charge in the past, no facts indicated that the defendant posed an immediate threat of serious physical injury to the officer at the time of the stop.

Here, as in *Amell* and *Dyer*, defendant was relaxed, unconcerned, and cooperative. He provided Mawdsley with his identification and calmly spoke with Cole while Mawdsley checked for warrants and obtained the information that he needed to write the citation. He did not react to

Cole's questions in a hostile way, nor did he make any furtive movements. None of defendant's conduct gave rise to an objectively reasonable suspicion that defendant posed an immediate threat of serious physical injury to the officers. To the contrary, as in *Dyer*, defendant and the officers were engaged in a routine traffic stop.

In light of defendant's demeanor, the fact that Mawdsley believed that defendant had lied about the number of times he had been arrested did not justify an extension of the traffic stop. Defendant was cooperative, not hostile. He had no prior convictions and no known history of violence against police officers. Under those circumstances, there was no basis for a belief that he posed an immediate threat of serious physical injury to the officers. *See Amell*, 230 Or App at 341, 345 (the defendant's lie about the status of his driver's license did not justify a request to search the defendant as an officer-safety measure).

The central fact on which Mawdsley based his suspicion that defendant had a weapon, and the only fact on which the trial court relied, was that defendant had been arrested the previous month for possessing a concealed handgun. However, prior arrests or convictions—even recent ones—without more, do not provide reasonable suspicion that a person is *currently* engaged in illegal conduct. *State v. Frias*, 229 Or App 60, 65, 201 P3d 914 (2009) ("[W]hatever the inference that could be reasonably drawn about [the] defendant's *past* drug use, there was no evidence of a current or imminent crime * * *. The fact that [the] defendant was awaiting sentencing on a drug charge does not give rise to reasonable suspicion that, at the time the officer prolonged the stop, [the] defendant was engaged in criminal activity."); *State v. Holcomb*, 202 Or App 73, 77-78, 121 P3d 13, *adh'd to as modified on recons*, 203 Or App 35, 125 P3d 22 (2005) (rejecting the state's argument that "a person's recent drug use is sufficient, without more, to establish reasonable suspicion of present drug possession"); *see also Dyer*, 157 Or App at 329 (the fact that the defendant had once been convicted of unlawfully possessing a weapon in a public building did not provide reasonable suspicion that he posed a threat to an officer during a traffic stop).

That principle is in keeping with the nature of the officer-safety exception to the warrant requirement. The officer's suspicion must be based on specific and articulable facts that give rise to an objectively reasonable suspicion that, at the time of the stop, the defendant poses an immediate threat of serious physical injury to the officer or another person then present. Here, where defendant was relaxed and cooperative during the stop and had no history of violence against police officers, there was no reason for Mawdsley to believe that defendant posed a threat to him or Cole. The fact that defendant had previously been arrested for carrying a concealed weapon did not indicate otherwise.

Reversed and remanded.