## STATE OF OREGON,
*Plaintiff-Respondent,*

v.

## MOISES MORFIN-ESTRADA,
aka Moises Morfinestrada,
*Defendant-Appellant.*

Multnomah County Circuit Court
090748809; A143650

283 P3d 378

Bear Wilner-Nugent argued the cause and filed the brief for appellant.

Douglas F. Zier argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

In this criminal case, defendant appeals the trial court's judgment convicting and sentencing him for one count of carrying a concealed weapon, ORS 166.240.[1] On appeal, defendant challenges the trial court's denial of his motion to suppress evidence that, he argues, derived from a violation of his rights under Article I, section 9, of the Oregon Constitution.[2] Specifically, defendant argues that, when the police officer who had stopped him for a traffic violation asked for his consent to a patdown for weapons, the officer unlawfully extended the duration of the traffic stop. We disagree. As explained below, like the trial court, we conclude that, when the officer asked defendant for his consent to a patdown for weapons, the officer had reasonable suspicion that defendant was carrying a concealed weapon. Therefore, although the request for consent extended the traffic stop, the extension was lawful. Accordingly, we affirm.

Whether an officer has unlawfully extended an otherwise lawful traffic stop in violation of Article I, section 9, is a question of law that we review for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993); *State v. Gomes*, 236 Or App 364, 370, 236 P3d 841 (2010). When we do, we are bound by the trial court's findings of historic fact, provided that there is constitutionally sufficient evidence in the record to support them. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). If the trial court did not make express findings, we presume that the trial court resolved factual disputes in a manner consistent with its ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We state the facts consistently with that standard.

---

[1] ORS 166.240(1) provides:

"Except as provided in subsection (2) of this section [which applies to certain peace officers], any person who carries concealed upon the person any knife having a blade that projects or swings into position by force of a spring or by centrifugal force, any dirk, dagger, ice pick, slungshot, metal knuckles, or any similar instrument by the use of which injury could be inflicted upon the person or property of any other person, commits a Class B misdemeanor."

[2] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

In the summer of 2009, Gresham Police Officer Galbreath worked the graveyard shift in east Portland. He dealt with gang activity on a nightly basis. Galbreath had previously found a variety of weapons, including firearms, on gang members. Violence between gangs was an ongoing problem, and it included stabbings and shootings. There had been an influx of new gangs into east Portland and a lot of gang fights that summer. Gangs fought over territory, which they claimed by marking it with graffiti tags. In Galbreath's experience, tagging was a chronic problem, and it caused conflicts between gangs. As Galbreath explained the practice,

> "rival gangs will come into another gang's area and scratch out, you know, whoever is claiming the turf or the area, scratch out their logo and put up their own. So it's a fight for power."

Shortly after midnight on July 23, 2009, Galbreath, who was in uniform and driving a marked patrol car, saw defendant and another man, Delgado, walk across 172nd Avenue against the traffic light, which is a Class D traffic violation. ORS 814.020(1)(b), (3). Galbreath pulled over and got out of his patrol car to talk to defendant and Delgado. He asked them what they were doing out so late at night. Defendant and Delgado pointed out some fresh graffiti on a nearby garage door. They told Galbreath that they were part of a neighborhood patrol and had come out because they had received a telephone call that someone had been spraying graffiti in the area. Galbreath told them that he had seen them cross the street against the traffic light.

Galbreath noticed that Delgado had what appeared to be a gang tattoo and asked both Delgado and defendant what gang they were in. Defendant answered that they were members of the Paso Robles Boys (PRB). Galbreath was familiar with that gang and had seen "a lot" of their tags in the Gresham area. The fresh tag was not a PRB tag. Defendant told Galbreath that he and Delgado had been stopped earlier that night by the gang team and that they had already been checked for warrants. Galbreath asked defendant and Delgado for their gang nicknames, which they provided and he wrote down. Galbreath then asked defendant for his real name, which defendant also provided.

Defendant offered Galbreath his identification card, and Galbreath took it to write down defendant's information and then returned it.

Sergeant Hernandez, who was part of the gang team, arrived. Like Galbreath, he was in uniform and driving a marked patrol car. He got out of his patrol car and stood next to Galbreath. He confirmed that the gang team had stopped defendant and Delgado earlier and they did not have any warrants.

About 10 minutes after he first contacted them, Galbreath asked defendant and Delgado if he could search them for guns. Delgado put his hands on his head, walked over to Galbreath, and turned around. Galbreath searched him, finding nothing. Galbreath turned to defendant and said, "How about you?" Defendant put his hands on his head and said, "I have my dagger in my left pocket." With defendant's hands above his head, Galbreath could see the hilt of the dagger, which had previously been concealed by defendant's shirt. Galbreath seized the dagger and arrested defendant for carrying a concealed weapon.

Before trial, defendant moved to suppress all evidence obtained as a result of Galbreath's request for consent to search. Citing *Hall*, defendant asserted that his consent was invalid because it was the product of an unlawful seizure, specifically, an unlawful extension of the traffic stop. In response, the state contended that the encounter between defendant and Galbreath was not a stop and, even if it was, during its course, Galbreath developed reasonable suspicion that defendant was carrying a weapon.

At the hearing on the motion, the prosecutor questioned Galbreath about why he had asked to search defendant and Delgado and whether he had reasonable suspicion that they were carrying weapons.

"[PROSECUTOR]: And why did you ask to search [them]?

"[GALBREATH]: Because there's—their gang activity and gang involvement. A lot of times I run into the gang—people involved in gangs, they'll have spray paint, a lot of graffiti coming up and down 172nd and there was graffiti

right behind them, looking for weapons, graffiti implements, guns, things they shouldn't have.

"[PROSECUTOR]: Given the tagging that was going on and their stated reason for being out, did you think it was reasonable or did you have a reasonable suspicion that they were carrying weapons?

"[GALBREATH]: I've ran into many gangsters that carry weapons, especially knowing that the tagging behind them was not their own and they were out on their neighborhood patrol, which I don't know of any neighborhood patrol there.

"You know, I was getting to the point where I believed that it might be coming out for the retaliation tagging of their turf."

Thus, Galbreath testified that he asked to search defendant and Delgado because of "their gang activity and gang involvement." As to whether he had reasonable suspicion that defendant and Delgado were carrying weapons, Galbreath testified that he had encountered many gang members who carry weapons and that he thought defendant and Delgado might be coming out to retaliate for the tagging of their gang's territory.

Concluding that Galbreath had stopped defendant, the trial court stated that defendant was "not free to go" and "[defendant] knew it and it was objectively reasonable for him to know it." The trial court also concluded that Galbreath's request to search extended the traffic stop "beyond its legitimate purpose."

Turning to the question of whether the extension of the stop was lawful, the trial court concluded that the extension was not justified as an officer safety measure, stating that "[t]here's no officer safety discussion here at all." But, the trial court concluded that the extension was justified as a criminal investigatory stop because the officer, in the trial court's view, had reasonable suspicion that defendant was carrying a concealed weapon.

The trial court acknowledged that there was no evidence that defendant or members of his gang had carried weapons in the past. But, the trial court focused on

defendant's gang membership and his reason for being out, specifically, that he was responding to a call about a tag that had been placed by another gang. Summarizing the evidence supporting Galbreath's suspicion that defendant was carrying a concealed weapon, the trial court stated:

"[T]here is at least a suggestion that we're in [PRB's] territory because the[y're] doing a neighborhood patrol and the[y're] concerned with some other gang, so we got that. It's their territory or the officer reasonably believes that.

"* * * * *

"So [the officer] knew * * * by the time he asked for consent to search for weapons, that the defendant was responding to a call about tagging. He knew from his training and experience that tagging is the focus of gang violence.

"And he knew from statements of the parties he was confronting that they were responding to such a call and concerned about such an event. I think the State gets there.

"* * * * *

"* * * [I]t is a particularized suspicion that these gang members under these circumstances at this time and place, responding to a call of a rival gang members tagging, would come armed."

The trial court noted that Galbreath could have "done a bit more to articulate" the bases for his suspicion but that it understood Galbreath to have meant that defendant and Delgado were gang members "responding to a rival gang's tag" and that "gang members often resort to violence about such things." Thus, the trial court concluded that Galbreath suspected that defendant and Delgado were armed and that Galbreath's suspicion was objectively reasonable.

On appeal, the parties renew the arguments they made in the trial court. Defendant argues that Galbreath's request to search defendant for weapons unlawfully extended the traffic stop because it was not supported by objectively reasonable suspicion that he was carrying a concealed weapon. In response, the state makes two arguments. First, the state argues that Galbreath did not

stop defendant at all; he only engaged defendant in "mere conversation." Second, and alternatively, the state argues that, if Galbreath did stop defendant, the request to search was not an unlawful extension of the stop because it was supported by objectively reasonable suspicion.

As mentioned, whether an officer has unlawfully extended an otherwise lawful traffic stop in violation of Article I, section 9, is a question of law that we review for errors of law. *Ehly*, 317 Or at 75; *Gomes*, 236 Or App at 370. For the reasons explained below, we conclude that (1) Galbreath stopped defendant, (2) Galbreath's request to search extended the stop, and (3) the extension was lawful because it was supported by reasonable suspicion that defendant was carrying a concealed weapon.

We turn first to the issue of whether Galbreath stopped defendant. For Article I, section 9, purposes, a stop is a type of seizure. *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010); *State v. Kennedy*, 290 Or 493, 498, 624 P2d 99 (1981); *State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978). As the Supreme Court recently held,

> "[a] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Ashbaugh*, 349 Or at 316 (emphasis in original; footnote omitted). A stop must be supported by reasonable suspicion. *Id.* at 308-09 (explaining that police-citizen encounters fall into three categories—mere conversation, stops, and arrests—and that a stop is a seizure that must be supported by a "safety emergency or by reasonable suspicion"); *Warner*, 284 Or at 161 (recognizing three types of encounters and observing that a stop must be supported by reasonable suspicion of criminal activity).

An officer stops a person when the officer engages in conduct that would cause the person to believe that the officer is conducting an investigation that could result in the person's citation or arrest at that time and place. *State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006); *State*

*v. Radtke*, 242 Or App 234, 239-41, 255 P3d 543 (2011). Accordingly, both we and the Supreme Court have held that, when an officer obtains identifying information from a person to run a warrant check, the officer has stopped the person. *Hall*, 339 Or at 19; *State v. Parker*, 242 Or App 387, 394, 255 P3d 624 (2011). That is so, the Supreme Court explained, because it is "difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." *Hall*, 339 Or at 19; *see also Parker*, 242 Or App at 394.

Likewise, we have held that, when an officer tells a person that the person has committed a violation or crime, the officer has stopped the person. For example, in *State v. Terhear/Goemmel*, 142 Or App 450, 459, 923 P2d 641 (1996), we held that an officer effectuated a stop, for Article I, section 9, purposes, when he told the defendant that he had seen him riding in a car without wearing his seatbelt. We explained,

> "[*The officer*] *began the encounter by telling* [*the defendant*] *that he had just seen him break the law. An ordinary citizen, faced with such a statement by a uniformed police officer, would not believe that he or she was free to leave.* Rather, a person in [the defendant's] position would reasonably believe that he or she was not free to go until the officer took some further action, such as issuing a citation or telling the individual that he or she could move on. Common experience and common sense permit no other answer."

*Id*. at 458 (emphasis added).[3]

Similarly, in *State v. Allen*, 224 Or App 524, 531, 198 P3d 466 (2008), we held that an officer had stopped the defendant when he told her that he "knew she was coming from a dope house" and "that if she was honest and gave [him] the dope [he] would give her a citation." We explained that the officer's statements were "tantamount to the announcement in *Terhear/Goemmel* that the officer had just seen defendant break the law." *Id*. Through the statements,

---

[3] *Terhear/Gommel* involved a violation of the statute, ORS 810.410(3)(b), governing traffic stops. But, as we have held, its reasoning is "equally applicable" in an Article I, section 9, analysis. *State v. Allen*, 224 Or App 524, 529 n 3, 198 P3d 466 (2008) (citing *Hall*, 339 Or at 33 n 19).

the officer had accused the defendant of committing a crime, possession of a controlled substance.[4]

In this case, the state contends that the trial court's conclusion that Galbreath stopped defendant is "certainly debatable." However, under *Terhear / Goemmel* and *Allen*, it is not. Galbreath told defendant that he had seen defendant and Delgado cross against the light. That is, he told them that he had just seen them break the law. As in *Terhear / Goemmel* and *Allen*, a reasonable person in defendant's position would believe that he was the subject of an ongoing investigation and was not free to leave until Galbreath either gave him a citation or indicated that he was free to go. Thus, like the trial court, we conclude that Galbreath stopped defendant.

Defendant acknowledges that Galbreath lawfully stopped defendant for the traffic violation. *See State v. Matthews*, 320 Or 398, 402, 884 P2d 1224 (1994) (stop for traffic violation must be supported by probable cause; applying ORS 810.410); *State v. Isley*, 182 Or App 186, 190, 48 P3d 179 (2002) (same); *see also State v. Rodgers / Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010) (same under Article I, section 9). But, defendant contends that, by asking to search, Galbreath extended the duration of the stop in violation of Article I, section 9. We turn to that issue.

An officer conducting a traffic stop may not extend the duration of the stop by inquiring about unrelated matters unless the inquiry is supported by reasonable suspicion that the person has engaged in criminal activity, *State v. Rodgers*, 219 Or App 366, 372, 182 P3d 209 (2008), *aff'd sub nom State v. Rodgers / Kirkeby*, 347 Or 610, 227 P3d 695 (2010), or that the person poses an immediate threat of serious physical injury to the officer or others nearby, *State v. Amell*, 230 Or App 336, 340, 215 P3d 910 (2009) (citing

---

[4] We distinguished the facts of *Allen* from those in *State v. Baker*, 154 Or App 358, 961 P2d 913, *rev den*, 327 Or 553 (1998), where we held that an officer did not stop a defendant by saying, "So Craig, did you buy any good crack in there?" In *Baker*, we explained that the officer "asked [the] defendant a question" and "did not announce that he had seen [the] defendant break the law." 154 Or App at 362. Correspondingly, in *Allen*, we explained that the officer in *Baker* "merely inquired whether the defendant had bought drugs." 224 Or App at 531. In this case, Galbreath did not ask defendant and Delgado whether they had crossed against the light; he told them that he had seen them do so.

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987)). Thus, as we have held, an officer conducting a traffic stop "is free to question a motorist about matters unrelated to the traffic infraction during an unavoidable lull in the investigation, such as while awaiting the results of a record check," but that officer "is not similarly free to question the motorist about unrelated matters as an alternative to going forward with the next step in processing the infraction, such as the writing or issuing of a citation," unless the questions are supported by reasonable suspicion of criminal activity or an immediate threat of serious physical injury. *Rodgers*, 219 Or App at 372; *see also Amell*, 230 Or App at 340; *Gomes*, 236 Or App at 371 ("[A] police officer unnecessarily and unlawfully extends the duration of a traffic stop when the officer begins a line of questioning unrelated to the traffic stop after having obtained, or instead of obtaining, the information necessary to proceed with citing the defendant."); *State v. Dennis*, 250 Or App 732, 739, 282 P3d 955 (2012) (observing that, in *Gomes*, we confirmed that the unavoidable lull rule articulated in *Rodgers* was unaffected by the Supreme Court's *Rodgers/Kirkeby* decision.

Applying that rule, we conclude that, in this case, Galbreath extended the traffic stop by requesting consent to pat down defendant for weapons. The request was not related to the reason for the stop, and it did not occur during an unavoidable lull in the stop. Instead of investigating the traffic violation, issuing a citation, or releasing defendant, Galbreath asked defendant if he would consent to a patdown. Thus, the final—and dispositive—issue in this case is whether Galbreath's request to pat down defendant was supported by reasonable suspicion.

The state argues that Galbreath had reasonable suspicion that defendant was engaged in criminal activity.[5]

---

[5] The state also argues that Galbreath had reasonable suspicion that defendant posed an officer safety threat. That argument is not supported by the record. There is no evidence that Galbreath's request for consent to patdown defendant was based on officer safety concerns. As the trial court stated at the hearing on defendant's motion to suppress, there was "no officer safety discussion here at all." Indeed, as the prosecutor himself said at the hearing, "I don't think [Galbreath] had officer safety issues * * *. [H]e didn't express officer safety concerns * * *."

Even assuming Galbreath had expressed such concerns, they would not have been objectively reasonable because there is no evidence that defendant and

168

An officer has reasonable suspicion that a person has committed or is about to commit a crime if the officer "holds a belief that is reasonable under the totality of the circumstances existing at the time and place" the officer acts. ORS 131.605; *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997); *Ehly*, 317 Or at 76 n 8 (analysis of a defendant's rights under stop statutes, including ORS 131.605, "is substantially the same as analysis of rights under Article I, section 9" (citing *Kennedy*, 290 Or at 497)). Reasonable suspicion has two components. The officer must subjectively believe that the person is engaged in criminal activity, and that belief must be objectively reasonable. *Belt*, 325 Or at 11; *Ehly*, 317 Or at 79.

To be objectively reasonable, an officer's suspicion must be based on specific and articulable facts. *Ehly*, 317 Or at 80; *State v. Mitchele*, 240 Or App 86, 91, 251 P3d 760 (2010). "Intuition or instinct, even of an experienced officer, cannot amount to reasonable suspicion." *State v. Houghton*, 91 Or App 71, 75, 754 P2d 13 (1988) (citing *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977)). Rather, "[t]here must be some facts or circumstances that distinguish the conduct of the individual stopped from that of other individuals who are not stopped." *State v. Ragsdale*, 34 Or App 549, 553-54, 579 P2d 286, *rev den*, 283 Or 503 (1978) (internal quotation marks omitted). In other words, an officer's suspicion must be "particularized to the individual [to be seized or searched] based on the individual's own conduct." *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004). It cannot be based entirely on generalized information or a person's appearance. *Id.* at 12-13 (observing that "a person's appearance alone never can support a reasonable suspicion of unlawful activity" and "clothing that announces a gang affiliation does not, by itself, give rise to the kind of individualized suspicion of a safety threat required by Article I, section 9"); *see also Valdez*, 277 Or at 628 (explaining that "shined shoes, sharp clothes, neat 'Afro' haircuts, and people who stand and stare at officers" did not support reasonable suspicion); *Bates*, 304 Or at 525 (explaining that the defendant's description of

Delgado—who had no known history of carrying weapons or being violent and who had been responsive and cooperative throughout the 10-minute stop—posed an immediate threat of serious physical injury. *See, e.g.*, *State v. Steffens*, 250 Or App 742, 282 P3d 888 (2012).

himself as "an 'Indian' with long hair and beard" wearing a black leather jacket at the time of the stop would not support reasonable suspicion).

Thus, as we have held in the context of cases involving searches for officer safety purposes, general information that gang members carry weapons is insufficient to give rise to a reasonable suspicion that a particular gang member is carrying a weapon. *State v. Pope*, 150 Or App 457, 462, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998) (officer's belief that the defendant was affiliated with a motorcycle gang and therefore likely to be armed and dangerous did not independently establish reasonable suspicion); *State v. Reinhardt*, 140 Or App 557, 562-63, 916 P2d 313 (1996), *rev dismissed*, 327 Or 521 (1998) (officer's knowledge from training and experience that members of outlaw motorcycle gangs often carry weapons was insufficient to give rise to reasonable suspicion that the defendant, who was wearing "biker attire," was engaged in criminal activity); *State v. Redmond*, 114 Or App 197, 201, 834 P2d 516 (1992) ("[P]erceptions of the stereotypical practices of motorcycle club members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion based on particularized facts.").

But, general information can combine with particular information about a person's conduct to give rise to reasonable suspicion. *See Miglavs*, 337 Or at 13 (under the totality of the circumstances, officer had reasonable suspicion that the defendant posed an officer safety threat where the defendant had been uncooperative during a late-night stop and his clothing demonstrated his affiliation with a local gang, several members of which had recently been found with weapons in the area); *Pope*, 150 Or App at 461-62 (the defendant's apparent gang affiliation together with the facts that he was armed and acted in a disconcerting manner during traffic stop gave rise to reasonable suspicion that he posed an officer safety threat); *Redmond*, 114 Or App at 201 (officer could frisk the defendant for officer safety purposes where the defendant was among a group of motorcycle riders; was stopped at one in the morning; was wearing gang clothing, including a patch that identified him as the "enforcer" for the gang; and was armed with a knife).

With those principles in mind, we return to the facts of this case. As the trial court observed, Galbreath's testimony could have been more clear. But, for the reasons explained below, we conclude that his testimony was sufficient to establish that he held an objectively reasonable suspicion that defendant was carrying a concealed weapon.

Galbreath knew that rival gangs were involved in disputes in the area, including disputes about their territories. He also knew that gangs marked their territories with graffiti tags and that, if one gang marked another's territory, it caused conflict. Tagging was, in Galbreath's words, part of "a fight for power." Galbreath also knew that many gang members carried weapons—he personally had found a variety of different types of weapons on gang members—and that their conflicts sometimes involved violence, including stabbings and shootings. Thus, Galbreath had information from which he could reasonably infer that gangs regard tagging by other gangs as intrusions into their territory, that the intrusions prompt retaliation, and that, because many gang members carry weapons and their conflicts sometimes involve violence, gang members presently engaged in retaliation for an intrusion into their territory will be prepared for conflict, including violent conflict.

In addition to the general information Galbreath had about gangs, he also had particular information about defendant. Galbreath knew that defendant was a gang member, that he and Delgado had received a call about a fresh tag and had responded by coming to the location of the tag, and that they were, in their own words, out on "neighborhood patrol." In addition, Galbreath knew that the fresh tag had not been placed by defendant's gang.

Considering both the general information Galbreath had about gangs and tagging and the particular information he had about defendant and his activities, Galbreath could reasonably infer that defendant's gang would regard the fresh tag as an intrusion into their territory. He could also infer that defendant, who had received a call about the tag and had come out in response to that call with another gang member, would be prepared to respond to the intrusion.

And, he could infer that, because such intrusions cause conflict and many gang members carry weapons, defendant would be prepared for potentially violent conflict. Like the trial court, we conclude that the facts known to Galbreath and the reasonable inferences he could draw from them are sufficient to establish an objectively reasonable suspicion that defendant was carrying a concealed weapon.[6] Therefore, we affirm the trial court's denial of defendant's motion to suppress.

In so doing, we emphasize that the issue in this case is whether Galbreath had objectively reasonable suspicion to request consent to search, not probable cause to search or arrest. And, like the trial court, we emphasize that our conclusion is based on the evidence about gangs and tagging in general *together with* the evidence about defendant's particular activities, most notably that, together with another gang member, he had been called to respond, and was responding to, a fresh tag by a rival gang.

Affirmed.

---

[6] To the extent that defendant argues that the earlier check by the gang team made Galbreath's suspicion of defendant less reasonable, we reject that argument. There is evidence in the record that the earlier "check" by the gang team included a "check" for outstanding warrants, but no evidence that it included a patdown for weapons. In addition, there is no evidence in the record about how much time had elapsed between the two encounters. Even if the gang team had patted down defendant for weapons earlier, he could have obtained a weapon in the interval.