Argued and submitted December 18, 2012, conviction on Count 1 reversed and remanded; otherwise affirmed December 31, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHAWN MICHAEL JACKSON,
*Defendant-Appellant.*

Lake County Circuit Court
090059CR; A147133

342 P3d 119

David A. Hill argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

DUNCAN, J.

## DUNCAN, J.

In this criminal case, defendant appeals a judgment convicting him of unlawful delivery of marijuana, ORS 475.860(2) (Count 1), arguing that the trial court erred in denying his motion to suppress evidence because the evidence derived from a violation of his rights under Article I, section 9, of the Oregon Constitution.[1] Defendant contends that the state trooper who discovered the evidence did so only after unlawfully stopping defendant and exploiting that unlawful stop to gain defendant's consent to a search of the trunk of his car. We conclude that defendant was stopped when the state trooper told him that he wanted to talk to him about a traffic violation that he had seen defendant commit. Because that stop was not supported by probable cause and the evidence at issue derived from the unlawful stop, we reverse and remand.

We begin with the facts, which we state consistently with the trial court's findings. On the evening of February 24, 2009, defendant drove through downtown Lakeview in a white car with California license plates. State Trooper Hargis was conducting a traffic stop there, but after defendant went by, Hargis made a U turn and came up behind defendant's car. Hargis followed defendant into the parking lot of a service station on Highway 395 one-and-one-half miles north of Lakeview. Hargis intended to buy a cup of coffee at the station. Defendant pulled up to the gas pumps at the station, and Hargis parked his patrol vehicle behind and to the right of defendant's car. Defendant got out of his car, put some garbage into a garbage can, and walked around the side of the gas station's convenience store toward the restroom. Hargis got out of his car and looked in the windows of defendant's car. He did not see anything that caught his attention. Then Hargis walked into the convenience store and bought a cup of coffee.

Hargis was still in the convenience store when defendant came into the store after using the restroom. Defendant bought an energy drink and paid for his gas. Hargis

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

approached defendant and told him that he wanted to talk to him about his failure to use a turn signal at a "Y" intersection between Lakeview and the gas station. Defendant told Hargis that he did signal, and Hargis told him that he had not signaled for 100 feet before the intersection. Then Hargis asked defendant where he was coming from, and defendant said that he had driven from Bend, where he lived, to Reno, Nevada, to visit his grandfather, who was ill, for the weekend and that he was returning to Bend. The car had California license plates because defendant had rented it for the trip. The conversation quickly turned to the topic of marijuana. At some point during the conversation, Hargis and defendant walked out of the convenience store side by side and stood on the sidewalk outside the store.

When he spoke with defendant, Hargis, who is a drug recognition expert, observed that defendant's eyes were bloodshot and watery, his speech was deliberate and slow, he repeated answers and questions, his pupils were dilated, and he had a "very relaxed demeanor." Hargis asked defendant whether he was on any medications, and defendant replied that he was not. Then Hargis asked defendant when he had last smoked marijuana. Defendant said that it had been more than a year since he smoked marijuana and that he did not smoke marijuana.

Based on the indicators listed above, Hargis believed that defendant was under the influence of marijuana. At the hearing, Hargis explained that the indicators showed that defendant had smoked marijuana recently—within 24 to 48 hours—but that marijuana intoxication lasts only a few hours after the marijuana is smoked. Hargis believed that defendant might have marijuana for personal use in the car.

In addition to believing that defendant was under the influence of marijuana, Hargis believed that defendant was trafficking marijuana. That belief was based on the indicators of marijuana use listed above, the fact that defendant had rented a car for a short trip to Reno, defendant's implicit admission that he had used marijuana more than a year before, and Hargis's training, which indicated that marijuana traffickers are likely to use marijuana during their trafficking trips.

Hargis asked defendant how much marijuana he had in the car, and defendant denied having marijuana. After defendant refused a request by Hargis to search the car for marijuana, Hargis told defendant that he was under investigation for DUII. He requested defendant's driver's license and rental agreement, and defendant consented to perform field sobriety tests. Rather than going forward with the field sobriety tests, Hargis sought to search defendant's car for drugs. After several requests, defendant consented to a search. During the search, Hargis found approximately half a pound of marijuana in the trunk of defendant's car. During a subsequent search of defendant, Hargis also found $3,923 in cash.

Hargis then checked defendant's pulse, which was within the normal range, and gave defendant two nonstandard field sobriety tests, a counting test and an alphabet test. Defendant passed those tests, and Hargis did not perform any others. Hargis believed that defendant was not impaired, and he did not pursue the DUII investigation further.

Defendant was charged with unlawful delivery of marijuana, ORS 475.860(2), and unlawful possession of marijuana, ORS 475.864, and the state alleged a criminal forfeiture count, ORS 131.582, for the cash. Defendant moved to suppress the marijuana, the cash, and his statements, arguing that the stop and detention had violated his rights under Article I, section 9, in several particulars. He argued that he had been stopped at at least three points during his encounter with Hargis; that none of those stops was supported by probable cause of the traffic violation or reasonable suspicion of the crime that was the reason for the stop; and that, in two instances, Hargis had unlawfully extended the stop. Defendant contended that his consent to the search, the evidence discovered during the search, and his incriminating statements resulted from exploitation of each of those unlawful stops and extensions. He also argued that his consent to the search was involuntary.

The trial court denied the motion to suppress, concluding that, although Hargis talked to defendant about the traffic violation, that interaction was not a stop. The court

also concluded that Hargis had reasonable suspicion that defendant was under the influence of marijuana and probable cause to believe that there was contraband in the car and that defendant consented to the search voluntarily. After a trial on stipulated facts, defendant was convicted of unlawful delivery of marijuana; the other two charges were dismissed. Defendant appeals, renewing his arguments that the trial court erred in denying his motion to suppress. We review the denial of a motion to suppress for errors of law. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005).

Article I, section 9, protects individuals against unreasonable searches and seizures. In order to be reasonable in the absence of a warrant, a search must fall within "one of the few specifically established and well-delineated exceptions to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (internal quotation marks omitted). The state bears the burden of proving that an exception to the warrant requirement justified a warrantless search or seizure; if it fails to do so, evidence derived from the search or seizure must be excluded. *Id.*; *Hall*, 339 Or at 21.

A search for which the police gain valid consent is excepted from the warrant requirement. *Id.* In order to be valid, consent must be voluntary. *Hall*, 339 Or at 20. In addition, "Article I, section 9, may require exclusion of evidence from an otherwise valid consent search upon the ground that the defendant's consent derived from a preceding violation of the defendant's rights under that state constitutional provision." *Id.* at 21. That is so because "the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law.'" *Id.* at 24 (quoting *Davis*, 295 Or at 234).

Defendant does not dispute that he consented to the search. However, he contends that his consent was derived from preceding violations of his rights under Article I, section 9. Thus, we must determine at what point during the encounter defendant was seized and whether that seizure was constitutionally permissible. We conclude that defendant was seized at the beginning of the encounter, when Hargis unambiguously told defendant that he had committed a

traffic violation and that Hargis wanted to talk to him about it. Hargis lacked probable cause for that stop; hence, the stop was unlawful. We also conclude that defendant's consent to the search derived from that unlawful stop. Accordingly, we reverse and remand.

The Oregon Supreme Court has explained that there are three types of encounters between police officers and individuals:

"(1) 'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9;

"(2) 'stops,' a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and

"(3) 'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime."

*State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010) (formatting modified). Stops and arrests are seizures; they are distinguished from mere conversation by "the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), citing *State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978)); *see also State v. Evans*, 16 Or App 189, 196-97, 517 P2d 1225 (1974) ("Restraint of liberty can arise either by means of physical force or show of authority, and the constraint of volition is equally real whether it arises by implication from the color of authority of the police or from their express command." (Citation omitted.)).

A person is seized under Article I, section 9, in either one of two situations:

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or

"(b)   if a reasonable person under the totality of the cir-
cumstances would believe that (a) above has occurred."

*Ashbaugh*, 349 Or at 316 (emphasis omitted; formatting
modified). Accordingly, an officer stops a person when the
officer explicitly or implicitly conveys to the person, "either
by word, action, or both, that the person is not free to termi-
nate the encounter or otherwise go about his or her ordinary
affairs." *State v. Backstrand*, 354 Or 392, 401, 313 P3d 1084
(2013).

Whether an officer's conduct amounts to a stop
is a fact-specific question, resolution of which requires an
examination of the totality of the circumstances. *Id.* at 399.
If, considered in light of the totality of the circumstances,
the officer's conduct gives rise to "a reasonable perception
that [the] officer is exercising his or her official authority to
restrain," then the officer's conduct constitutes a stop. *Id.* at
401.

Questions, requests, or statements can have the
effect of stopping a person. *Rodgers/Kirkeby*, 347 Or at 627-
28; *Ashbaugh*, 349 Or at 317 ("[I]t is possible to restrict a
person's liberty and freedom of movement by purely verbal
means[.]"). Along with the context in which the question,
request, or statement is made, factors relevant to whether
it results in a stop include its content, the manner in
which it is asked, and the officer's accompanying physical
acts. *State v. Anderson*, 354 Or 440, 453-54, 313 P3d 1113
(2013).

An officer stops a person when he or she commu-
nicates that he or she is conducting an investigation that
"could result in the person's citation or arrest at that time
and place." *State v. Morfin-Estrada*, 251 Or App 158, 164,
283 P3d 378, *rev den*, 352 Or 565 (2012); *see also State v.
Warner*, 284 Or at 165 (the defendant was seized when
an officer told the defendant to present his identification
card and advised him that he was the subject of a crimi-
nal investigation); *State v. Zaccone*, 245 Or App 560, 567,
261 P3d 1287 (2011), *rev den*, 355 Or 381 (2014) (where the
sequence of events allowed an inference that the "defendant
was the subject of a continuing investigation," a reasonable

person "would believe that his or her freedom of movement had been significantly restricted by [the officer's] show of authority").

*Morfin-Estrada* is illustrative. In that case, an officer on patrol shortly after midnight observed the defendant and another man, Delgado, cross a street against the traffic light, a traffic violation. 251 Or App at 160. The officer asked the two men what they were doing out so late; after they answered, he told the men that he had seen them cross the street against the traffic light. *Id.* After further conversation, the defendant consented to a patdown search for weapons, and the officer found a dagger. The defendant was convicted of carrying a concealed weapon, and he appealed, arguing that the trial court should have granted his motion to suppress evidence because it was obtained in violation of his rights under Article I, section 9. *Id.* at 159.

We explained that a stop occurs "when an officer tells a person that the person has committed a violation or crime." *Id.* at 165 (citing *State v. Terhear/Goemmel*, 142 Or App 450, 459, 923 P2d 641 (1996) ("[The officer] began the encounter by telling [the defendant] that he had just seen him break the law. An ordinary citizen, faced with such a statement by a uniformed police officer, would not believe that he or she was free to leave.")); *see also State v. Allen*, 224 Or App 524, 531, 198 P3d 466 (2008) ("[The] defendant was seized when [an officer] told her that he 'knew she was coming from a dope house' and 'that if she was honest and gave [him] the dope [he] would give her a citation.'" (Third and fourth brackets in original.)). Then we concluded that the officer had stopped the defendant by telling him that he had seen the men cross against the light:

> "[The officer] told defendant that he had seen defendant and Delgado cross against the light. That is, he told them that he had just seen them break the law. As in *Terhear/Goemmel* and *Allen,* a reasonable person in defendant's position would believe that he was the subject of an ongoing investigation and was not free to leave until [the officer] either gave him a citation or indicated that he was free to go."

*Morfin-Estrada*, 251 Or App at 166.

Here, Hargis informed defendant that he had committed a traffic violation—failing to use his turn signal—and that Hargis "want[ed] to talk to him" about it. Defendant responded that he had used his turn signal. In response, Hargis reasserted that he had seen defendant break the law: he replied that defendant had not signaled for the required 100 feet before the intersection. *See* ORS 811.335(1)(b) (failing to "signal continuously during not less than the last 100 feet traveled by the vehicle before turning" is a traffic offense). Then Hargis began questioning defendant about his itinerary and drugs. He did not inform defendant that he had decided not to cite him for the traffic violation, and he did not tell defendant that he was free to go. As in *Morfin-Estrada*, the assertion that Hargis had seen defendant commit a traffic violation stopped defendant. A reasonable person in defendant's position would believe that he was not free to leave until Hargis gave him a citation or indicated that he was free to go.

The Supreme Court's recent decision in *Backstrand* does not affect our reasoning. In *Backstrand*, the court held that a "mere request for identification" does not give rise to a stop in a context where the addressee would not perceive it as an accusation. 354 Or at 410; *see also id.* at 414-16 (noting that a person questioned about his or her age in an age-restricted setting "might reasonably expect to be told to leave if he or she either would not or could not produce valid identification sufficient to verify that he or she was not a minor," but that being told or required to leave a place where a person has no lawful right to remain is not a restraint on a person's liberty); *see also State v. Highley*, 354 Or 459, 473, 313 P3d 1068 (2013) (the defendant was not stopped by an exchange during which an officer confirmed the defendant's statement that he was off probation). Where there is an accusation, however, there is still a stop. *State v. Rodriguez-Perez*, 262 Or App 206, 211, 325 P3d 39 (2014) (the defendant was stopped when "the officers approached [the] defendant and his brother, told them that they suspected that the men were violating a law, and asked for identification").

*Anderson*, a companion case to *Backstrand*, also supports our conclusion. There, pursuant to a warrant, the

police were searching an apartment, which belonged to Wilson, for evidence of drug activities. *Anderson*, 354 Or at 443. The defendant and his girlfriend drove up and parked near the apartment during the search. They got out of the car and "peeked" into the apartment, then quickly returned to the car and prepared to drive away. *Id.* (internal quotation marks omitted). Three officers approached the car. The officers explained that they "were executing a search warrant at the apartment and that they were contacting them 'to find out who [defendant and the driver] were, what interest they might have had with what [the police] were doing there, or maybe they knew the * * * individual that lived there.'" *Id.* (brackets and ellipses in *Anderson*). Then the officers asked the defendant and his girlfriend for identification. *Id.*

The Supreme Court held that the defendant was not stopped by the approach, the explanation, or the request for identification. First it concluded that, under its precedent, no part of the encounter—the approach, the explanation, or the request for identification—constituted a stop *per se*. *Id.* at 452-53. Then it explained that the content of the officers' requests, the manner in which they were made, and the overall context of the contact did not "elevate[] the encounter to the level of a seizure by conveying to defendant and the driver that the officers would not allow them to leave." *Id.* at 453. The court noted that the content of the explanation and the request for identification was not coercive. It elaborated as follows:

> "[The] explanation of the officers' reasons for the contact and the officers' requests for identification informed defendant and the driver that the officers were interested in why they had come to the apartment and what they knew about Wilson's activities. That information objectively conveyed possible suspicion that the driver and defendant could be involved in criminal activity related to the apartment, but they equally conveyed that the officers were interested in whatever information the two might be able to provide."

*Id.* The court concluded that, under those circumstances, "the officers did not communicate an exercise of * * * authority to restrain" through the verbal exchanges. *Id.*

Hargis's statements here differ in two significant ways from the statements and request in *Anderson.* First, Hargis's statements did not convey "possible suspicion" that defendant had committed a traffic violation. Instead, they *unambiguously* conveyed that defendant had committed a traffic violation, that Hargis had seen him do it, and that Hargis required defendant to stay while Hargis talked to him about it. That difference is significant in light of the Supreme Court's concern in this context, which is to avoid "limiting contacts between police and citizens" when police officers are not restraining citizens' liberty by behaving in ways that "exceed[] the bounds of ordinary social encounters between private citizens." *Backstrand,* 354 Or at 400. When police officers make statements conveying possible suspicion, under some circumstances, they may not be exercising their authority to restrain. *Id.* at 401. In contrast, where, as here, an officer makes a direct and unambiguous accusation, the officer has conveyed that the citizen is not free to leave; he or she must "stop, respond, and remain until the immediate investigation [is] complete." *Id.* at 418 (Walters, J., concurring in the judgment).

The second significant difference between the statements in *Anderson* and the statements in this case is that the statements here did not "equally convey[]" any desire for information or any assistance. To the contrary, when defendant responded to Hargis's first statement by saying that he had, in fact, used his turn signal, Hargis reasserted that defendant had committed a traffic violation by failing to signal for 100 feet before the intersection. His repetition of the accusation reinforced that he was not interested in any explanation or assistance from defendant. That conveyed that Hargis was exercising his authority to restrain by preventing defendant from going about his business until Hargis had completed the traffic stop. Accordingly, Hargis stopped defendant by informing defendant that he had observed him commit a traffic violation and wanted to talk to him about it.

It is the state's burden to establish that a traffic stop is supported by probable cause. *State v. Matthews,* 320 Or 398, 403, 884 P2d 1224 (1994). In this case, the state

has not argued, either in the trial court or on appeal, that Hargis had probable cause to stop defendant for failing to signal. The state's primary argument has been that Hargis never told defendant that he wanted to talk to him about failing to signal and, therefore, could not have stopped him by doing so. Hargis testified that he first remembered seeing defendant as he pulled into the gas station, and he did not testify that he had said anything to defendant about a failure to signal. To the contrary, he explained that, if he turned around to follow a car and saw a traffic violation, he would include that information in his report, which he did not do in this case.

The trial court did not accept Hargis's testimony on that point. The trial court accepted defendant's testimony that Hargis had told him that he wanted to talk to him about failing to signal. In light of the trial court's finding, the state makes a secondary argument on appeal, contending that "even if the subject of a failure to signal came up during the conversation, it did not transform the encounter into a traffic stop." The state does not argue that, if Hargis stopped defendant by stating that he wanted to talk to him about failing to signal, the stop was justified.

In order for the stop to be justified, it would have to be supported by subjective and objective probable cause. *State v. Isley*, 182 Or App 186, 190, 48 P3d 179 (2002) ("Probable cause exists if, at the time of the stop, the officer subjectively believes that the infraction occurred and if that belief is objectively reasonable under the circumstances."). Here, defendant's testimony permits an inference that Hargis subjectively believed that defendant had committed a traffic violation: Defendant testified that Hargis told him that he had failed to signal 100 feet before the intersection, and the trial could find (but would not be required to find), that Hargis made that statement because he believed that defendant had failed to signal. But, the record is insufficient to support a conclusion that, if Hargis had such a belief, it was objectively reasonable. "[A]n officer's subjective belief that a traffic infraction occurred is objectively reasonable if, and only if, the facts as the officer perceived them actually satisfy the elements of a traffic infraction." *State v. Tiffin*, 202 Or App 199, 204, 121 P3d 9 (2005); *see also State v. Vanlom*, 232

Or App 492, 496, 222 P3d 49 (2009) ("To determine whether [the officer] had probable cause to stop [the] defendant for failure to drive within a lane, we must decide whether he perceived facts establishing the elements of that traffic violation."). In this case, there is evidence about Hargis's belief or conclusion, but not about the facts upon which he based that belief or conclusion. Therefore, the record is insufficient to establish that Hargis's stop of defendant was supported by probable cause that defendant had committed a traffic violation. As a result, the stop was unlawful and the question becomes whether the results of the unlawful stop must be suppressed.

To answer that question we consider whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9. *See Davis*, 313 Or at 249 (Oregon's constitutional protection against unreasonable searches and seizures includes the right to be free from the use, in a criminal prosecution, of evidence obtained in violation of defendant's rights under Article I, section 9). Whenever the state has obtained evidence following the violation of a defendant's Article I, section 9 rights, it is presumed that the evidence was tainted by the violation and must be suppressed. *Unger*, 356 Or at 84. The state may rebut that presumption by establishing that the disputed evidence "did not derive from the preceding illegality." *Hall*, 339 Or at 25.

When determining whether a defendant's consent to search is the product of exploitation of police misconduct, courts are to consider the totality of the circumstances, including whether the temporal proximity between the misconduct and the consent; the existence of any intervening or mitigating circumstances; the nature of the misconduct, including its purpose and flagrancy and whether the police took advantage of it; and the voluntariness of the consent. *Unger*, 356 Or at 89-93.

The Supreme Court "observed in *Hall* and reaffirmed in *Unger* that exploitation of police misconduct may exist if the police seek the defendant's consent solely as a result of knowledge of inculpatory evidence obtained from their unlawful conduct." *State v. Musser*, 356 Or 148, 335

P3d 814 (2014) (citing *Hall*, 339 Or at 35; *Unger*, 356 Or at 76). On this point, *Musser* is illustrative. In *Musser*, an officer illegally stopped the defendant and, in the course of the stop, made observations that caused him to make further inquiries and, ultimately, request and receive the defendant's consent to a search of her purse. 356 Or at 150. In holding that the defendant's consent was the product of the illegal stop and that the results of the search of the purse had to be suppressed, the Supreme Court noted that the consent was obtained during the stop; there were no intervening or mitigating circumstances; the stop was an effort to direct and control the defendant and was for the purpose of conducting an investigation; and during the stop the officer made observations that prompted him to ask additional questions and ultimately request and receive consent. *Id.* at 157-58. The court commented that the officer was concerned about possible illegal activity, but the officer's "generalized concern"

"gave way as the encounter developed, with the officer eventually focusing—as defendant well understood—on drug possession. The initial and developing purpose of the police misconduct in continuing to detain defendant while inquiring about various possible crimes shows the state taking advantage of that misconduct in a way that likely had an effect on defendant's decision to consent."

*Id.* at 159. Therefore, the evidence derived from the illegal stop—including the evidence obtained as a result of the consent search of the defendant's purse—was tainted and, therefore, inadmissible. *Id.*

The facts of this case are similar to those in *Musser*. Here, after Hargis unlawfully stopped defendant, he questioned defendant about his trip and whether he had any drugs with him. During that questioning, he noticed signs that defendant had smoked marijuana recently. Based on those signs and defendant's answers to Hargis's questions, Hargis suspected that defendant had driven under the influence of intoxicants and that defendant might have marijuana in the car. He detained defendant to investigate those suspicions and, during that detention, defendant consented to the search of his car and Hargis discovered the disputed evidence. Thus, as in *Musser*, defendant's consent

to the search derived from the stop for the traffic infraction. Accordingly, the trial court erred in denying defendant's motion to suppress.

Conviction on Count 1 reversed and remanded; otherwise affirmed.