Submitted November 25, 2014, reversed and remanded April 22, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD DANIEL NORTON,
aka Richard Daniel Norton, Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
130242038; A154334

349 P3d 576

Peter Gartlan, Chief Defender, and David Sherbo-Huggins, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Michael S. Shin, Senior Assistant Attorney General, filed the brief for respondent.

Before Lagesen, Presiding Judge, and Flynn, Judge, and De Muniz, Senior Judge.

FLYNN, J.

Lagesen, J., dissenting.

## FLYNN, J.

Defendant appeals a judgment of conviction for carrying a concealed weapon, ORS 166.240 (Count 1), and felon in possession of a restricted weapon, ORS 166.270 (Count 2). He challenges the trial court's denial of his motion to suppress evidence found during a patdown search to which he consented. Defendant argues that the officer's request to search came while defendant was "stopped" in violation of Article I, section 9, of the Oregon Constitution, and that the state failed to prove that the police did not exploit their illegal detention of defendant in violation of his constitutional rights.[1] The state responds only to defendant's argument that he was unconstitutionally stopped at the time that he gave consent to the search, which led to the discovery of the incriminating evidence. We conclude that the encounter constituted an unlawful stop prior to the consent to search and that the state failed to carry its burden to prove that the evidence is nevertheless admissible. We, accordingly, reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

Before discussing the legal standards governing our analysis, we briefly describe the circumstances under which the search occurred, consistent with the trial court's findings. *State v. Ehly*, 317 Or 66, 75, 854 P3d 421 (1993). On February 14, 2013, defendant and two male companions stood on a street corner in a high crime area of east Portland. One of defendant's companions started to cross the street against the light just as Portland Police Officers Lemons and Hamby drove by. The officers pulled into a driveway near defendant's group, and, while Hamby took the companion aside to discuss the jaywalking, Lemons stood nearby as a cover officer. Defendant began a conversation with Lemons in which he described a citation he had recently received for

---

[1] Defendant does not contend that the state failed to prove defendant voluntarily consented to the search. *See State v. Hall*, 339 Or 7, 20, 115 P3d 908 (2005) ("[A]s a threshold matter in *any* case in which the state relies upon a defendant's consent to validate a warrantless search, the state must prove by a preponderance of the evidence that the defendant's consent was voluntary." (Emphasis in original.)).

jaywalking. Within a few minutes, a second police car arrived with two more officers, one of whom—Officer Edwards—was the officer who had issued defendant the recent jaywalking citation. Edwards and Lemons briefly discussed Edwards's knowledge of and prior contact with defendant, and then Lemons walked away to run a records check on defendant.

While Lemons was away, defendant initiated a "terse" conversation with Edwards in which defendant accused Edwards of being "unfair" during the citation incident. Edwards used a "firm" tone to explain why defendant had received the citation and warned defendant that his behavior needed "to change so he doesn't get arrested." Edwards also told defendant that he had two years to look at the jaywalking incident and, "[i]f I wanted to arrest him, then I had that ***." Meanwhile, Lemons learned that defendant had a history of drug and weapons charges and, due to that information, recontacted defendant to ask if defendant had any drugs or weapons on him. Defendant responded that he had a knife, which prompted Lemons to request consent for a patdown search. Lemons retrieved the knife from the pocket in which defendant said it could be found; the knife was the basis for the charges of carrying a concealed weapon, ORS 166.240, and felon in possession of a restricted weapon, ORS 166.270.

Prior to trial, defendant moved to suppress all evidence, including the knife, as derived from a "warrantless, unlawful stop, seizure, search and arrest of Defendant" in violation of Article I, section 9. The trial court reasoned that "whether this motion is granted or denied ultimately turns on *** who initiated contact with whom ***." It viewed that as a "close question" but ultimately denied defendant's motion based on the following findings:

> "*** I find, based on everything I heard, that it's more probable than not that in fact [defendant] initiated contact with these two officers to express [his] upset and concern over the prior jaywalking incident. I find it's also more probable than not that [defendant] stayed on scene because [he's] with two folks [he was] close to and [defendant] wanted to see how that was likely to play out with the one fellow who was being cited.

"* * * * *

"I will add there was one other finding I wanted to make, which is the fact that [defendant] did testify that * * * [he did not] recall that well the events in dispute * * *."

Defendant entered into a conditional plea of guilty to both of the charged offenses, reserving his right to seek review on appeal of the denial of the suppression motion, as permitted by ORS 135.335(3).

## ANALYSIS

Article I, section 9, protects the rights of individuals against unreasonable government searches and seizures.[2] In order to give effect to that constitutional protection, "evidence from a search following an otherwise valid consent is subject to suppression under the Oregon exclusionary rule if the defendant's consent is the product of preceding unlawful police conduct." *State v. Hall*, 339 Or 7, 36, 115 P3d 908 (2005). "That is so because 'the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if "the government's officers had stayed within the law."'" *State v. Jackson*, 268 Or App 139, 143, 342 P3d 119 (2014) (quoting *Hall*, 339 Or at 24 (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983))). Therefore, "[w]here [a] motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution." ORS 133.693(4); *State v. Sargent*, 323 Or 455, 461, 918 P2d 819 (1996); *see also State v. Ordner*, 252 Or App 444, 447, 287 P3d 1256 (2012), *rev den*, 353 Or 280 (2013) (the state has the burden of proving the lawfulness of a warrantless traffic stop) (citing *Sargent*, 323 Or at 461).[3]

Here, as in cases like *Hall*, 339 Or at 40, and *State v. Unger*, 356 Or 59, 87-88, 333 P3d 1009 (2014), the state relies upon the "legally valid consent" exception to warrantless searches. *Unger* establishes that the inquiry into suppression

---

[2] Article I, section 9, provides, in pertinent part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[3] By contrast, when the police have acted under the authority of a warrant, the burden is on the defendant to prove the unlawfulness of a search or seizure. *State v. Walker*, 350 Or 540, 553, 258 P3d 1228 (2011) (citations omitted).

of evidence related to a consent search involves three "overlapping issues":

> "(1) whether the initial stop or search was lawful; (2) whether the defendant's consent to the subsequent search was voluntary; and (3) assuming that the initial stop or search was unlawful and the consent to the subsequent search was voluntary, whether the police exploited the illegality to obtain the disputed evidence."

356 Or at 70-71. When a defendant consents to a search during the course of an unlawful seizure, the state bears the burden of demonstrating both that the consent to search was voluntary and that "the voluntary consent was not the product of police exploitation of the illegal stop or search." *Id.* at 75. Here, defendant contends that his consent to search was the product of an unlawful stop. The state, as it did in the trial court, disputes only the assertion that defendant was seized within the meaning of Article I, section 9, before the search, and that is the only issue we decide.[4]

The Supreme Court has emphasized that encounters between law enforcement and citizens are of an "infinite variety," of which "only some" trigger the Article I, section 9, prohibition against unreasonable seizures. *State v. Backstrand*, 354 Or 392, 398, 313 P3d 1084 (2013) (citations and quotation marks omitted). "'[T]emporary detentions for investigatory purposes, often termed "stops,"'" are a seizure for constitutional purposes and generally require reasonable suspicion. *Id.* at 399 (quoting *State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013)). The test for whether an encounter between law enforcement and a citizen is a "seizure" is whether "a reasonable person [would] believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Id.* (citing *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010)). The inquiry into whether a seizure has occurred is fact specific and based on the "totality of

---

[4] The narrow focus of the state's argument means that we are not called upon to decide whether—if defendant was stopped—the state proved the stop was lawful based on reasonable suspicion, or some other justification, or whether the state proved defendant's consent was not the product of exploitation of an unlawful stop.

the circumstances in the particular case." *Hall*, 339 Or at 18 (citation omitted).

The trial court agreed with the state that defendant was not stopped before the search. Although we defer to the trial court's express and implied findings if supported by constitutionally sufficient evidence, *Ehly*, 317 Or at 75, "we must assess independently whether those findings support the trial court's legal conclusion," *Hall*, 339 Or at 17 (citing *Ehly*). The trial court reasoned that whether defendant was stopped turned on "who initiated contact with whom" and found that defendant initiated both the conversations with Lemons and Edwards. Those findings, however, do not dispose of the stop inquiry because, after defendant initiated the conversations with Lemons and Edwards, the nature of the encounter continued to evolve. As circumstances develop, an encounter can shift from an ordinary police-citizen encounter to a seizure. *See, e.g., Ehly*, 317 Or at 79 (where the defendant searched through bags at request of the officers, interaction rose to seizure when officer put her hand on her gun and ordered the defendant to step away from the bags); *Hall*, 339 Or at 19 (initial noncoercive encounter where the officer stopped his vehicle next to the defendant and gestured for him to approach evolved into a seizure as the officer began to investigate the defendant by taking the defendant's identification card and conducting a warrant check).

Here, after defendant began the conversation with Edwards, several developments coalesced to convert the encounter into one in which a reasonable person would believe that the officers were intentionally and significantly restricting defendant from leaving until Lemons's investigation was complete. First, Edwards lectured defendant in a "very firm" manner about his "'behavior[,]' what could have happened[,] and how it needs to change so he doesn't get arrested." He also warned defendant that, "[i]f I wanted to arrest him, then I had that, but I didn't say I had a hold on him. I didn't say he couldn't—prohibit him from doing anything. I had two year—two years to look at the case. It's the [s]tatute of [l]imitations." Edwards testified that he did not use body language that would convey an intention to arrest defendant or to intimidate him so that he would not feel free to leave, and we do not hold that a conversation of that

nature necessarily conveys the idea that a person subjected to such a lecture is not free to walk away. The warnings from Edwards, however, are a key part of the "totality of the circumstances." *See Ehly*, 317 Or at 76 (the officer's tone can have a coercive effect); *cf. Jackson*, 268 Or App at 149 (concluding that the defendant was stopped when the officer made "a direct and unambiguous accusation" that the defendant had committed a traffic violation and wanted to talk to him about it). Inherent in Edwards's assertion of authority to arrest defendant was the implication that defendant had previously committed jaywalking or some other offense for which he could still be held criminally liable.

Edwards's warnings also set the tone for the rest of the encounter when Lemons "recontacted" defendant. At that point, the attention of two officers was focused directly on defendant with two other officers in the immediate area. Moreover, defendant knew that he had already provided Lemons with the information from which his criminal background—including a felony conviction—could be determined.[5] Although "something more than just asking a question, requesting information, or seeking an individual's cooperation" is needed to elevate an ordinary police-citizen encounter to a seizure, a request coupled with other circumstances can elevate the encounter to the level of a seizure, such as when "the content or manner of questioning, or the accompanying physical acts by the officer * * * would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Backstrand*, 354 Or at 403 (quoting *Ashbaugh*, 349 Or at 317).

Here, those additional circumstances that suggest an exercise of authority to coercively detain defendant include that Lemons approached defendant while Edwards was still lecturing him and asked a question that suggested an investigation of possible criminal activity. *See State v. Rodriguez-Perez*, 262 Or App 206, 211-12, 325 P3d 39 (2014) (holding circumstances were sufficiently coercive to constitute a seizure

---

[5] The testimony was in conflict regarding whether Lemons took defendant's identification or simply asked for and remembered defendant's name and date of birth. The trial court's ruling does not imply a finding on this issue one way or the other, but the issue is ultimately not dispositive.

when two officers approached defendant and his brother, told them that they suspected the men of being too young to possess the beer they were carrying, and asked for identification). The nature of the encounter was also shaped by the fact that Lemons's investigatory question and request to search came immediately after Edwards had warned defendant that he could be arrested if he did not modify his "behavior." In their totality, the circumstances here reasonably would be "construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request"; a reasonable person would not feel free to ignore the questions and simply walk away. *See also State v. Rodgers/Kirkeby*, 347 Or 610, 626, 227 P3d 695 (2010) (concluding that the defendant, who was asked following a completed traffic stop whether he possessed any weapons and would agree to permit a patdown, "had no way of knowing that [the] questions and request to search the car were not part of the traffic investigation and that his cooperation in [the] investigation was not required to continue"). We agree with the trial court that this encounter presents a "close question[,]" but conclude that, under the totality of the circumstances, the encounter escalated to a stop by the time Lemons questioned defendant about possession of weapons or drugs.

Our determination that defendant was seized for purposes of Article I, section 9, means that the evidence must be suppressed unless the state proves "that the consent was voluntary and was not the product of police exploitation of that illegality." *State v. Musser*, 356 Or 148, 150, 335 P3d 814 (2014) (citing *Unger*, 356 Or at 74-75). Because the state made no effort before the trial court (or on appeal) to demonstrate that the evidence obtained during the unlawful stop is nevertheless admissible, we reverse the denial of defendant's motion to suppress. *See State v. Rider*, 216 Or App 308, 315, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008) (concluding that the defendant's consent was the unattenuated product of the unlawful stop because the state advanced no argument that some fact or circumstance severed the causal connection between the stop and the defendant's consent).

Reversed and remanded.

**LAGESEN, J.,** dissenting.

I respectfully dissent from the majority's conclusion that defendant was seized before he granted consent to officers to search his person, and I would affirm the judgment of the trial court.

The determination of whether a person has been seized for purposes of Article I, section 9, of the Oregon Constitution is fact intensive in nature, *State v. Backstrand,* 354 Or 392, 399, 313 P3d 1084 (2013), and my disagreement with the majority stems primarily from my understanding of the facts, viewed through the lens of our standard of review. Here, the trial court ultimately concluded that, "I just am not finding anything here, again, beyond the bare, at the very most macro level suggesting that this was an unlawful stop." Presuming that the trial court found all of the historical facts in the manner consistent with that ultimate conclusion that nothing like a stop occurred, *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993), I believe that conclusion is correct. That is, I believe that the trial court correctly concluded that the facts about the encounter, as it necessarily found them, failed to demonstrate "a show of authority by which, through words or action, the officer's conduct reasonably convey[ed] that the officer [was] exercising his or her authority to significantly restrain [defendant's] liberty or freedom of movement." *Backstrand,* 354 Or at 402.

The record, when read in the light most favorable to the trial court's ruling,[1] reveals the following about the encounter at issue.

Around 11:45 a.m. on Valentine's Day 2013, defendant was walking with two companions in southeast Portland.

---

[1] The trial court expressly discounted defendant's testimony about the encounter based on defendant's admission that it was "hard for [him] to remember actually how that day went." The court explained, "[T]here was one other finding I wanted to make, which is the fact that [defendant] did testify that [he] [wasn't] sure—[he] [doesn't] recall that well the events in dispute, for whatever reason, but that was [his] testimony, and I do find that factors into my conclusions, as well." We are bound by that factual determination regarding the persuasiveness of defendant's testimony. *State v. Johnson,* 335 Or 511, 523, 73 P3d 282 (2003). Accordingly, I draw the facts from the testimony of the two police officers who testified about the incident, relying on defendant's testimony to the extent that it is not inconsistent with the version of events presented by the officers.

One of his companions started to cross the street against the pedestrian signal, in a manner that apparently constituted jaywalking. Officer Lemons and his partner, Officer Hamby, observed defendant's companion start to cross the street against the signal, parked their car, and got out to investigate the jaywalking incident. Hamby pulled the jaywalker aside, while Lemons stood by as a cover officer.

The officers did not detain defendant or his other companion, and they could have continued on their way had they wanted to do so. However, defendant and his other companion decided to wait while their friend was investigated for jaywalking. While waiting, defendant struck up a conversation with Lemons, telling Lemons that he had received his own citation for jaywalking several weeks earlier. Defendant explained the circumstances that led to his own jaywalking citation, and Lemons told defendant that, based on how defendant described the circumstances, it sounded like defendant had jaywalked. Lemons then explained to defendant how to tell when it was okay to walk and when it was not: "We even used the hand signal, the pedestrian signal, through a cycle. I said, 'Okay, you see that? That's— You can't—Okay, you can't walk here. Now you've got to stop.' We went through that articulation." During that lesson on lawful street crossing, Lemons asked defendant his name and birth date, and defendant provided that information; Lemons did not take defendant's identification.[2] The conversation between Lemons and defendant was friendly.

---

[2] The majority observes that defendant provided conflicting testimony about whether Lemons took defendant's identification, but concludes that the trial court did not necessarily make a finding on the point and that such a finding is not necessary to the analysis of whether defendant was stopped at any point in his encounter with Lemons and then Officer Edwards. 270 Or App at 591 n 5. I disagree with that analysis. At the time that the trial court decided defendant's motion to suppress, we had ruled, in effect, that taking a person's identification resulted in a *per se* seizure. *See State v. Highley*, 219 Or App 100, 106, 180 P3d 1230 (2008), *rev'd*, 354 Or 459, 313 P3d 1068 (2013). To conclude that defendant was not seized under then-current law, the trial court necessarily had to find that the officers did not take defendant's identification. Moreover, whether or not the officers took defendant's identification is one of the circumstances bearing on the assessment of whether defendant was seized at some point in the encounter. Although the taking and short retention of identification does not, standing alone, automatically amount to a seizure, *Highley*, 354 Or at 472-73, it is conduct that points to a seizure in a way that the absence of such conduct does not.

Defendant was "upset about that jaywalking violation but he didn't take it out on" Lemons.

While Lemons and defendant were talking, two more police officers arrived on the scene, Officer Strawn and Officer Edwards. As is their common practice, Lemons and Hamby had "put it out on the air" that they were going to be out of their car with three people as they initiated the jaywalking stop of defendant's companion. Strawn and Edwards had received that notification, and they had come to the scene to provide cover. Strawn stood by the patrol car, while Edwards approached Lemons and defendant.

As it happens, Edwards was the officer who had cited defendant for jaywalking a few weeks earlier. As soon as defendant saw Edwards, "it was almost like it set off a light switch in his head." Defendant "just went into orbit" because of his anger about the jaywalking citation. Defendant immediately addressed Edwards, recounting the jaywalking incident and "telling [Edwards] about how unfair and unjust he felt he was treated." When defendant turned his attention to Edwards, Lemons went to run a records check on defendant.

Edwards, meanwhile, attempted to defuse defendant's anger about the jaywalking citation, in part by pointing out to defendant that, at the time of defendant's prior jaywalking incident, Edwards also had probable cause to arrest defendant for criminal activity, but had not done so. Edwards advised defendant that Edwards had "[t]wo years to look at the case" and that defendant should change his behavior in order to avert the need for Edwards to follow up on that potential line of investigation. Edwards did so in an attempt to de-escalate the situation with defendant and encourage him to improve his behavior:

> "[Defendant] was clearly upset with rehashing the old, and one of the things that we use as police officers and as a unit is tools to target and deal with specific type[s] of uncivilized behavior because there's a lot of it out there, and I was very firm with [defendant] about 'your behavior[,]' what could have happened and how it needs to change so he doesn't get arrested. But that conversation was more or less a one-way because he wasn't getting what I was telling him."

Edwards's conversation with defendant was in response to defendant's "rehashing" of the prior jaywalking incident and was limited to that incident. Edwards used a "firm" tone in response to "the way [defendant] was talking to [him], * * * meaning, 'This is what you did. This is what you got stopped for. You behave this way, we're not tolerating that.'" Edwards did not draw his weapon, put his hand on his Taser, or physically block defendant's path or do anything else to prevent defendant from leaving if defendant chose to do so.

The records check on defendant disclosed a history of drug and weapons charges. Lemons then recontacted defendant and asked him if he had any drugs or weapons. Defendant acknowledged having a knife. Lemons asked defendant where the knife was and if Lemons could retrieve it; defendant told Lemons that the knife was in his left pocket and permitted Lemons to retrieve it.

The issue for us is whether anything in that sequence of events—standing alone or through the process of "alchemy" with the other circumstances of the encounter— evidences "a show of authority by which, through words or action, the officer's conduct reasonably convey[ed] that the officer [was] exercising his or her authority to significantly restrain [defendant's] liberty or freedom of movement." *Backstrand*, 354 Or at 402 (stating legal standard for seizure); *State v. Highley*, 354 Or 459, 473, 313 P3d 1068 (2013) (describing as "alchemy" the process by which actions that are not seizures individually can nonetheless combine to transform an encounter into a seizure). It does not. As *Highley* indicates, Lemons's request for defendant's name and birth date, the running of a records check, his question about drugs or weapons, and the request for consent to search do not, in and of themselves, constitute seizures. 354 Or at 473. Beyond that, no discernible process of "alchemy" transmuted defendant's interaction with Lemons and Edwards into a seizure before the time that defendant consented to the search for the knife.

That defendant initiated the conversations with Lemons and Edwards is significant. By starting those conversations, defendant invited the responses from Lemons and Edwards. *State v. McFarland*, 210 Or App 744, 749-50,

152 P3d 967 (2007) (fact that the *defendant* initiated contact with officer by calling 9-1-1 and made contact with officer when he arrived on the scene precluded conclusion that officer stopped the defendant when he asked her to pull over so that he could speak with her); *State v. Spenst,* 62 Or App 755, 758-59, 662 P2d 5, *rev den,* 295 Or 447 (1983) (fact that the *defendant,* who had voluntarily pulled over to the side of the road, initiated contact with officer by speaking to him through the closed car window precluded conclusion that officer stopped the defendant when he approached the defendant's vehicle). Of course officers *could* respond to an encounter initiated by a citizen with words or conduct amounting to a seizure (by, say, ordering the person not to move, handcuffing them, or drawing a weapon), but the officers' responses here were of the sort that a reasonable person in defendant's position would expect under the circumstances, given the nature of defendant's communications to the officers. Although Edwards responded to defendant by mentioning the fact that he had "[t]wo years to look at" the criminal activity that he had noted in his last interaction with defendant, he did not do so in a way that indicated that defendant was currently under investigation, or that defendant could not just walk away, or that otherwise conveyed that Edwards was "exercising his * * * authority to significantly restrain" defendant. *Backstrand,* 354 Or at 402. If anything, it appears that Edwards was attempting to tell defendant how to improve his behavior so as to avoid getting arrested in the future—a message that would not indicate to an objectively reasonable person that the officer was imposing a significant restraint on the person's liberty.

Finally, upon recontacting defendant after the records check, Lemons did nothing that would reasonably convey that the nature of the encounter had suddenly shifted from one controlled largely by defendant to one in which the officers were imposing a significant restraint on defendant's liberty. Lemons simply asked questions, and there is no evidence that he did so in a manner that would signal to defendant that defendant was now restrained. *See Highley,* 354 Or at 470-71 (verbal inquiries generally are not seizures). Under the circumstances of this particular encounter (as I believe the trial court necessarily found those circumstances

to be), an objectively reasonable person in defendant's position would have felt free to leave at the time that defendant consented to Lemons retrieving the knife.

In the words of the trial court, I do "not find[] anything here" that amounts to a seizure under Article I, section 9, as that term has been defined by the Supreme Court. Accordingly, I dissent.